IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KEVIN DVORAK, et al., Individually and as the Representative of a Class of Similarly Situated Persons, | ) ) ) ) |
| Plaintiffs, | ) Case No. 14-CV-1119-SMY-RJD ) |
| vs. | ) ) |
| ST. CLAIR COUNTY, ILLINOIS, et al. | ) ) |
| Defendants. | ) |

## **MEMORANDUM AND ORDER**

Plaintiffs Kevin Dvorak and Kathleen Dvorak[1] are proceeding on an eight count class action Complaint (Doc. 2). The case involves an alleged conspiracy to fix St. Clair County, Illinois real estate tax sales so that owners were required to pay artificially high interest penalties to redeem their properties. The defendants include St. Clair County, St. Clair County Treasurer Charles Suarez, and a number of individual and business purchasers who are alleged to have participated in the conspiracy (collectively, "Purchaser Defendants"). Now pending before the Court is Plaintiffs' Motion for Class Certification (Doc. 208). Defendants have all replied (Docs. 219, 221, 222, 224, and 230). For the following reasons, Plaintiffs' Motion for Class Certification is **DENIED**.

### **Background**

This case revolves around St. Clair County, Illinois real estate tax sales for properties for which the prior year's property taxes are delinquent. The County Collector (an *ex officio* role of

---

[1] The named plaintiffs originally included John R. Bloyer, Jr. and Adrianne L. Bloyer. They have voluntarily dismissed their individual claims. (Doc. 120).

the County Treasurer) conducts the sales.  Purchasers do not receive clear title to the property at issue, but rather a Certificate of Purchase and the right to collect the amount of unpaid taxes from the owner plus a "penalty" ranging from 0 to 18 percent interest.  Each successful bidder pays the county the amount of the delinquency.  The winning bidder for a given parcel is the one who is willing to accept the lowest penalty rate if the owner exercises his/her/its right of redemption.  The maximum penalty percentage that may be bid is 18 percent, and if no bids are received on a given property, it reverts to the County at the maximum penalty rate.

For example, a property with a $2000 overall delinquency is offered at the tax sale.  One bidder offers 18 percent – meaning that he will pay the $2000 to the county and charge the property owner an additional 18 percent, if she wishes to redeem the property.  Another bidder offers 13 percent – meaning that the property owner would pay less to redeem the property.  If no lower bids are received, the second bidder receives the Certificate of Purchase.

If a property owner fails to redeem a property within the statutory redemption period, the successful bidder may file a Petition for a tax deed.  Once a tax deed is issued, it conveys merchantable title, free and clear from most previous interests in the property.

If the property is redeemed, the purchaser of the tax lien receives the certificate amount (what is owed to the county) plus the penalty percentage.  The penalty rate increases every six months by the amount of the penalty rate that was originally bid.  Using the above example, the property owner would owe the winning bidder $2,260 if redeemed within six months, $2,520 if redeemed between six months and a year, $2,780 if redeemed between a year and 18 months, etc.  The holder of a tax lien may also pay subsequent unpaid real estate taxes on a property and claim an automatic 12 percent penalty on the subsequent taxes.

Because the cost of redemption is usually significantly less than the market value of the

property, there is a strong incentive for anyone holding a sizeable ownership or security interest in the property to redeem it following a tax sale. If a property owner is unable to pay the cost of redemption, it is common for a mortgage holder or other lienholder to redeem on behalf of the property owner in order to preserve their interest. The amount paid on the owner's behalf is then added to the owner's outstanding obligation.

Here, Plaintiffs maintain that something went very wrong with this process at the St. Clair County tax sales conducted in 2007 and 2008. Specifically, they allege that Defendant Suarez—in exchange for political contributions for himself and the "Democrat Party of St. Clair County"— arranged for the auctioneer to recognize the Purchaser Defendants as winning bidders (presumably in cases of identical bids) and to distribute the winning bids from the various auctions between the Purchaser Defendants. (Doc. 2 at ¶¶74, 79). They also allege that Suarez arranged for the Purchaser Defendants to have advantageous seating positions and caused the auctioneer to ignore subsequent lower bids, thereby artificially inflating the penalty rates. For their part, the Purchaser Defendants are alleged to have agreed to keep their bids at or near the 18 percent statutory maximum penalty rate. (*Id.* at ¶74).

Plaintiffs Kevin and Kathleen Dvorak owned two properties that were sold at the 2007 St. Clair County real estate tax sale conducted in November 2008. (*Id.* at ¶¶6-11). The first property is located at 518 E. Washington St., O'Fallon, Illinois ("Washington Property"); the second property is located at 619 W. Schuetz St., Lebanon, Illinois ("Schuetz Property"). Both properties were purchased by Defendant White Oak Securities at a penalty rate of 18 percent and redeemed on November 8, 2011 by mortgage holder, First Federal Savings Bank (Docs. 208-4 at 2; 208-5 at 3). Because the redemption took place nearly three years after the sale, $1,725.03 in penalty interest was assessed on a $1,597.25 tax bill for the Washington Property. (Doc. 208-5

at 3). Redemption of the Schuetz Property cost $2,018.22 in penalty interest on a $1,868.72 2007 tax bill, which was paid by the same mortgage holder. (Doc. 208-4 at 2). Both properties were sold at tax sales before and after the 2006 and 2007 tax year sales at penalty rates ranging from one to three percent. (Docs. 278-2 and 278-3).

Plaintiffs assert eight causes of actions, including claims against all defendants for Civil Conspiracy (Count I), violations of the Sherman Anti-Trust Act (Counts III and IV) and violations of the Illinois Antitrust Act, 740 ILCS 10/1, *et seq*. (Counts V-VII). They also assert claims for Money Had and Received against all defendants except Suarez (Count II) and breach of fiduciary duty against Suarez alone (Count VIII). In each Count, Plaintiffs allege damages "based on the difference [between] the amount redeemed and the amount that would have been needed to redeem the property at a reasonable and appropriate penalty rate[,]" plus attorneys' fees, expenses and trebling of damages where allowed by statute. (Doc. 2)

## **Legal Standard**

Plaintiffs move for class certification under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, seeking to certify a plaintiff class consisting of:

> all owners of real estate parcels that were sold at a St. Clair County Tax sale auction for unpaid real estate taxes for the 2006 and 2007 tax years with respect to which a Certificate of Purchase was obtained at such auction in response to a penalty rate bid in excess of 0 percent, excluding the owners of parcels for which there were no bids and therefore were "sold" to St. Clair County at penalty rate of 18% by operation of statute.

(Doc. 208 at ¶ 3).

To be certifiable, a class must be definable and must meet the requirements of numerosity, commonality, typicality and adequacy of representation. *See* Fed. R. Civ. P. 23(a); *Alliance to End Repression v. Rochford,* 565 F.2d 975, 977 (7th Cir. 1977). The case must also fall within one of the three enumerated Rule 23(b) categories*. Spano v. The Boeing*

*Co.*, 633 F.3d 574, 583 (7th Cir. 2011) ("(1) a mandatory class action (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common questions predominate and class treatment is superior.").

A class may be certified only if a district court is "satisfied, after a rigorous analysis," that compliance with Rule 23 has been shown, even if the analysis entails some overlap with the merits. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Although a plaintiff bears the burden of showing that the proposed class satisfies the Rule 23 requirements, he "need not make that showing to a degree of absolute certainty." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012) (internal citation omitted).

## Discussion

As an initial matter, Defendants Dennis Ballinger Sr., Dennis Ballinger Jr., Empire Tax Corp. and Vista Securities, Inc. (collectively "Ballinger Defendants") challenge the proposed class definition as "fatally overbroad." (Doc. 230 at 23). They object to the inclusion of every owner whose property was purchased or a penalty rate above 0% in the 2006 and 2007 tax sales, arguing that definition may encompass a significant number of property owners (1) whose penalty rate was at or below what it would have been in a "normal" year, (2) whose property was not redeemed and therefore did not pay the allegedly inflated penalty rates, or (3) whose claims would be barred by the statute of limitations.

A class may be overbroad "if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." *Messner*, 669 F.3d at 825 *citing Kohen v. Pacific Investment Management Co.*, 571 F.3d 672, 677 (7th Cir.2009). However, the mere fact that a proposed class contains members who ultimately will not be able to recover once the merits of the case are reached does not preclude certification of the class. *See Kohen*, 571 F.3d

at 677 ("[a] class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable because at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown. Such a possibility or indeed inevitability does not preclude class certification[.]") The determining factor is whether the class includes a significant number of individuals who *could not* have been harmed by a defendant's allegedly unlawful conduct. *Messner*, 669 F.3d at 824.

It is possible that Plaintiffs' proposed class contains owners who received the same rate they would have received in an auction that was not (allegedly) "rigged" and who therefore, would not have compensable damages. But sorting them out from those who did sustain an injury is an issue to be decided on the merits. By contrast, it is not possible for owners who did not redeem their property to have sustained the damages alleged in the Complaint. Because they did not actually pay the inflated rate, they cannot recover the difference between what they paid and the amount due under a "reasonable and appropriate" penalty rate.[2] Because it is unclear from the pleadings and the parties' submissions whether the proposed class includes a significant or trivial number of such owners, Court cannot conclude at this juncture that the proposed class is fatally overbroad.

### Rule 23(a) Requirements

*Numerosity*

In order to meet the numerosity requirement, Plaintiffs must establish that there are a sufficient number of class members that joinder would be impractical. "Although there is no 'bright line' test for numerosity, a class of forty is generally sufficient." *McCabe v. Crawford &*

---

[2] Conceivably, an owner of an unredeemed property could claim that it would have redeemed it at the "reasonable and appropriate" penalty rate, but that the inflated rate caused them to forego the option. However, that is neither the claim before the Court, nor one that would be appropriate for class treatment as it would be speculative and would require extensive individual inquiries.

*Co.,* 210 F.R.D. 631, 643 (N.D. Ill. 2002) (citation omitted). This is not a hard-and-fast rule, however. "A class can be certified without determination of its size, so long as it's reasonable to believe it's large enough to make joinder impracticable and thus justify a class action suit." *Arnold Chapman and Paldo Sign & Display Co. v. Wagener Equities Inc.,* 747 F.3d 489, 492 (7th Cir. 2014).

Here, the proposed class is sufficiently numerous. The auction results for the 2006 tax year show in excess of 3700 properties that were bid upon and awarded at rates over 0%. (Doc. 230-2 at 208-311). There were more than 3500 such properties purchased at the 2007 tax year auction. (*Id.* at 313-432). While there may be a number of owners with multiple properties within this group, it is reasonable to assume that the class would number at least in the hundreds, if not thousands. The numerosity requirement is therefore satisfied.

*Commonality*

Rule 23(a) also requires the existence of at least one question of law or fact common to the class. Fed. R. Civ. P. 23(a)(2); *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). The putative class members' "claims must depend on a common contention" and "[t]hat common contention…must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* 564 U.S. at 350. "A common nucleus of operative fact is usually enough to satisfy the commonality requirement." *Keele,* 149 F.3d at 594.

The existence of the alleged conspiracy between Suarez and the Purchaser Defendants in this case is the type of common issue contemplated by the rule. All of the claims asserted in the

Complaint require proof of the existence of a conspiracy to manipulate the penalty rates at these two auctions. This meets the commonality threshold.

*Typicality*

To satisfy typicality, "there must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano*, 633 F.3d at 586. The typicality requirement addresses concerns that (1) the representative's claim may fail on unique grounds, dooming meritorious claims of absent class members or that (2) the representative's claims may prevail on unique grounds, and the representative may therefore fail to adequately present alternative grounds under which the unnamed class members could prevail on their own claims. *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011). The "presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation." *Id.* at 726, *citing J.H. Cohn & Co. v. American Appraisal Associates, Inc.*, 628 F.2d 994, 999 (7th Cir. 1980). Here, Plaintiffs' claims are not sufficiently typical of the class to support certification because their claims are subject to a statute of limitations defense.

The statutes of limitations for claims grounded in state law are governed by the applicable state law. *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). Conspiracy, standing alone, is not a separate and distinct tort in Illinois. *See Weber v. Cueto*, 624 N.E.2d 442, 449 (1993). Rather, a civil conspiracy claim is subject to the same statute of limitations as the underlying tort on which the claim is based. *Mauvais–Jarvis v. Wong*, 987 N.E.2d 864, 894 (2013). A private action for violation of the Illinois Antitrust Act, 740

ILCS 10/1, *et seq.* (Counts V-VII) must be commenced within 4 years after the cause of action accrued. 740 ILCS 10/7(2). In the context of an antitrust conspiracy, accrual is generally triggered by the last overt act in furtherance of the alleged conspiracy. *People ex rel. Hartigan v. Moore*, 493 N.E.2d 85, 86 (1986).

Claims for "money had and received" (Count II) and breach of fiduciary duty (Count VIII) must be commenced within five years after the cause of action accrued. 735 ILCS 5/13-205. The Sherman Act carries a statute of limitations of four years (15 U.S.C. § 15b), and generally, a federal antitrust cause of action "accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006) *quoting Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).

The last tax sale involved in this case was on November 10, 2008, which is when the tax liens on Plaintiffs' properties were sold. (Doc. 230-4 at 78). Plaintiffs have not alleged any overt acts in furtherance of the alleged conspiracy after that sale. While they claim that Defendants "actively and fraudulently concealed these violations," this allegation appears to relate to meetings that occurred prior to the auctions at issue. Nor do Plaintiffs claim that their injury arose from any act committed after November 10, 2008. Because the instant action was filed on October 17, 2014 – five years, eleven months and four days later (Doc. 2), facially, Plaintiffs' claims were filed out of time.

The Plaintiffs contend that application of the "discovery rule" moves the accrual for their claims forward to at least a press conference in May of 2014, making the filing of the Complaint timely. Under the discovery rule, the accrual date for statute of limitations purposes "is not determined when the injury occurs but when it is discovered or should have been discovered."

*Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 688 (7th Cir. 2004). When the discovery rule applies, a statute of limitation begins to run "once a plaintiff has knowledge which would lead a reasonable person to investigate the possibility that her legal rights had been infringed." *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 992–93 (7th Cir. 2002); *citing LaSalle v. Medco Research, Inc.*, 54 F.3d 443, 446 (7th Cir. 1995); *Khan v. Deutsche Bank AG*, 978 N.E.2d 1020, 1029 (2012) (citation omitted) ("When a party knows or reasonably should know both that an injury has occurred and that it was wrongfully caused, the statute begins to run and the party is under an obligation to inquire further to determine whether an actionable wrong was committed").

The question of when the Dvoraks knew or should have known that they had been wrongfully injured renders their claims vulnerable to a statute of limitations defense not necessarily applicable to other members of the putative class. There is some discrepancy between the Complaint allegations and Plaintiffs' discovery responses regarding how and when they first became aware of their potential claims against Defendants. In the Complaint, Plaintiffs allege that they and members of the class

> "…were unaware of and did not learn of Defendants' conspiracy until approximately June of 2014, when it was publicly disclosed by the Treasurer of Madison County, Kurt Prenzler, after much research and analyzing different and seemingly unrelated records, that Defendant, Charles Suarez, had accepted "political contributions" from the Defendants and that these same Defendants had purchased properties in St. Clair County at the maximum 18% interest rate. The connection between Charles Suarez and Defendants Rothman, Vassen and McClean and that Defendants had engaged in a conspiracy to rig public auctions for the real estate tax sales in St. Clair County during the Class Period was disclosed for the first time in June 2014."

(Doc. 2 at ¶¶90-91).

Plaintiffs further allege that Defendants and those involved in the alleged conspiracy "actively and fraudulently concealed these violations to obscure their illegal

activity by meeting and discussing amongst themselves for the express purpose of rigging the public auction." (*Id.*). Essentially, in the Complaint, Plaintiffs assert that they did not know, and that reasonable diligence would not have uncovered, the information indicating wrongful conduct and injury until Kurt Prenzler's press conference.

But Kathleen Dvorak's deposition testimony is inconsistent with the Complaint allegations. She testified that she and her husband did not become aware of any possible issues with the property tax auctions until October 2014 (Deposition of Kathleen Dvorak, Doc. 271-4 at 5), and that she first learned of a potential issue when a letter from Ken Brosh was left at the Washington Property.[3] She also testified that, "[t]he high interest rate" led her to believe that the sales were illegally conducted or rigged, and the 18 percent rate "on its face struck [her] as being wrong based on [her] prior experience of redeeming at a much lower interest rate," (*Id.* at 4, 10), and that she knew that their properties had been sold at the 18 percent rate for the 2007 tax year shortly after the sale had occurred. (*Id.* at 11).[4]

Given Mrs. Dvorak's testimony, that her sole basis for believing that she and her husband's rights had been infringed was the abnormally high penalty rate that the Washington and Schuetz Properties were sold for at the 2007 tax year auction compared to prior years, and her admission that she was aware of the 18 percent rate shortly after the sale took place in November 2008, one could reasonably find that the statutes of limitations began to run for the Dvoraks when Kathleen Dvorak received the 18 percent rate information. Depending on when

---

[3] Kevin Dvorak testified in his deposition that his wife handles the financial matters in the household, that he was not significantly involved with the current matter and had no personal knowledge of any of the allegations in the Complaint other than the fact that he owned the properties, and that they were sold for delinquent taxes and eventually redeemed. (Docs. 271-5 at 3 and 278-6 at 4-5).

[4] Brosh, a competing tax auction buyer, steered Kathleen Dvorak to attorney Don Weber, who in turn referred her to Plaintiffs' Counsel's law firm. (*Id.* at 6-7).

that information was received, some or all of the Dvoraks' claims may be time-barred, notwithstanding the application of the discovery rule.

Application of the discovery rule may yield a different result for some or all of the remainder of the putative class. For example, the Dvoraks had significant experience dealing with property tax sales on their properties, which is a central explanation given for how Kathleen Dvorak "knows" that something improper happened at the 2007 tax year sale. On the other hand, the same information would not necessarily put another putative class member with no prior experience with tax sales on notice that further investigation was warranted. In that instance, Kurt Prenzler's May 2014 press conference could arguably be the first notice they had that their "injury" (paying a higher than normal rate) may have been wrongfully caused. Because the Dvoraks' claims may be dismissed on grounds not applicable to absent class members, their claims are not sufficiently typical to support class certification.

*Adequacy*

For purposes of Rule 23(a)(4), "adequacy of representation is composed of two parts: the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the class members." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993) (quotation omitted). The adequacy requirement is satisfied when the named representative has "a sufficient interest in the outcome of the case to ensure vigorous advocacy" and "does not have interests antagonistic to those of the class." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 480 (N.D. Ill. 2009).

A class representative may be found inadequate if they are subject to a unique defense that could compromise his or her ability to adequately represent the class. The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to

him so that the representation of the rest of the class will suffer." *CE Design*, 637 F.3d at 726. Because the Dvoraks' claims may uniquely be subject to a statute of limitations defense, certification of a class with them as the only class representatives would be inappropriate.

### Rule 23(b) Requirements

Even if a named plaintiff satisfies Rule 23(a), they must also satisfy one of Rule 23(b)'s three subsections. Here, the Dvoraks proceed under Rule 23(b)(3), which allows for certification upon a finding that "questions of law or fact common to members of the class predominate over any questions affecting only individual members," and that "a class action is superior to other available methods for resolving the controversy." Fed. R. Civ. P. 23(b)(3). Their motion also fails on this basis.

"Rule 23(b)(3)'s predominance requirement is met when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Messner*, 669 F.3d at 815 (quotation omitted). "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." *Id.* (quotation omitted).

Predominance "trains on the legal or factual questions that qualify each class member's case as a genuine controversy" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 624 (1997). The predominance requirement overlaps considerably with Rule 23(a)(2)'s commonality requirement, but is "far more demanding." *Id*. "Where liability determinations are both individual and fact intensive, class certification under Rule 23(b)(3) is improper." *Miller v.*

*Janssen Pharmaceutical Prod., L.P.*, No. 05-CV-4076-DRH, 2007 WL 1295824, at *7 (S.D. Ill. May 1, 2007).

"Analysis of predominance under Rule 23(b)(3) begins, of course, with the elements of the underlying cause of action." *Messner*, 669 F.3d at 818, *quoting Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804, 809 (2011). Antitrust claims require that a plaintiff prove: (1) that the defendant violated antitrust law; and (2) that the antitrust violation caused them some injury. *Id.* (citations omitted). "[I]ndividual injury (also known as antitrust impact) is an element of the cause of action; to prevail on the merits, every class member must prove at least some antitrust impact resulting from the alleged violation." *Reed v. Advocate Health Care*, 268 F.R.D. 573, 581 (N.D. Ill. 2009) *quoting In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 311 (3d Cir. 2008), as amended (Jan. 16, 2009). A plaintiff's burden at the class certification stage is to "demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Messner,* 669 F.3d at 818 (quotations omitted).

In this case, the "fact of injury" is not susceptible to common class proof, and would require individualized inquiry to determine whether the sale of a given parcel was actually higher than it would have been in the absence of the alleged conspiracy. As the defendants note, "[o]ut of all of the parcels that sold to tax buyers for 2006 and 2007 at a rate of 1-18% that also were up for auction for 2004-2005 and 2008-2012, 59% sold at the same or higher rate in at least one other year." (Doc. 230 at 11). This suggests that a significant number of properties owned by putative class members were not in fact impacted by the alleged anticompetitive behavior.

Plaintiffs have not identified a class-wide applicable method for determining whether a given parcel was impacted by the conspiracy. They merely assert that "[t]he bids at the 2006 and

2007 St. Clair County taxes sales were significantly higher than those of the years preceding and after," and "[i]t will also be the same evidence for all class members." (Doc. 231 at 6). These conclusory assertions alone do not survive the "rigorous analysis" required for class certification.[5] *See Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) ("Mere assertion by class counsel that common issues predominate is not enough.")

Plaintiffs fare no better on the question of whether individualized damages defeat certification in this case. Defendants correctly point out that a number of factors influence what a potential tax purchaser would bid on a property, including location, size, terrain, zoning, condition of any structures and accessibility. (Doc. 221 at 17). Obviously, these factors vary from parcel to parcel. In the absence of a class-wide factual or statistical methodology for determining which properties were affected by the alleged antitrust violations, the Court would be forced to engage in a complicated and tedious property-by-property analysis of whether each property was purchased at a higher rate than it would have in a non-tainted auction – presumably by taking into consideration a combination of historical data (if a given property had been sold in other years) and expert testimony as to that parcel's characteristics as viewed by a disinterested tax auction purchaser.

Plaintiffs concede that the class claims will require individualized proof for damages, but emphasize that the need for individualized damage determinations is not necessarily grounds to deny certification. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654 671, (7th Cir. 2015). That is true, but if "…fact of damage cannot be established for every class member through proof

---

[5] Subsequent to filing their Motion for Class Certification, Plaintiffs disclosed Dr. Carl Peters as an expert. Dr. Peters appears to have conducted some statistical analyses regarding the overall results of the 2006 and 2007 tax year auctions and how they compare with other years and other counties. (Peters Expert Report, Doc. 255-1). While Dr. Peters posits an overall potential damage figure, he offers no figures or methodology which would enable a finder of fact to determine whether any given parcel had been impacted by the alleged anticompetitive behavior.

common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance" (quotation omitted) *Reed*, 268 F.R.D. at 582 (N.D. Ill. 2009).

Moreover, Rule 23(b)(3) also requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Factors relative to this determination include the class members' interests in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already begun by or against class members; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the likely difficulties in managing a class action. *Id.*

Class action is not the superior vehicle for litigation of this matter. Rather, a class action would rapidly become unmanageable. While it would be more efficient to consolidate the litigation as it relates to that existence of a conspiracy, that benefit is outweighed by the necessity of conducting hundreds or thousands of individualized hearings on impact and damages. The Court acknowledges that because of (relatively) low individual recovery potential, individual class members would not likely be interested in personally controlling their claims. On balance, however, this Court concludes that, based on the above-detailed issues with respect to predominance and superiority, class certification is inappropriate under Rule 23(b)(3).

## Conclusion

For the foregoing reasons, Plaintiffs' Motion for Class Certification (Doc. 208) is **DENIED.** Plaintiffs' Motion for Leave to File Supplemental Exhibit (Doc. 264) is **DENIED** as moot.

**IT IS SO ORDERED.**

**DATED:  January 23, 2018**

**s/ Staci M. Yandle**
**STACI M. YANDLE**
**United States District Judge**
