**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **KEVIN DVORAK, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 14-CV-1119-SMY-RJD** |
| | ) | |
| **ST. CLAIR COUNTY, ILLINOIS, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiffs Kevin Dvorak and Kathleen Dvorak[1] are proceeding on an eight Count Complaint asserting an alleged conspiracy to fix St. Clair County, Illinois real estate tax sales so that property owners were required to pay artificially high interest penalties to redeem their properties. The defendants include St. Clair County, St. Clair County Treasurer Charles Suarez, and a number of individual and associated business purchasers who are alleged to have participated in the conspiracy (collectively, "Purchaser Defendants").

Before the Court are Defendants' Motions for Summary Judgment (Docs. 265, 266, 267, 268, 269, 270 and 272). Plaintiffs have filed responses to most, though not all, of these motions (Docs. 278, 279, 280, 281, 282, 283).[2] For the following reasons, Defendants' motions (Docs. 265, 266, 267, 268, 269, 270 and 272) are **GRANTED.**

---

[1] The named plaintiffs originally included John R. Bloyer, Jr. and Adrianne L. Bloyer. They have voluntarily dismissed their individual claims. (Doc. 120).

[2] Many of the motions refer to and purport to join each other. For purposes of simplicity and clarity, the Court will address the generally-applicable grounds for summary judgment as a group, as well as those well-pled grounds which pertain to specific defendants and Counts.

## BACKGROUND

This case arises from certain St. Clair County real estate tax sales of properties for which the prior year's property taxes are delinquent. The general structure and requirements for the tax sales are set forth in Article 21 of the Illinois Property Tax Code (35 ILCS 200/21 *et seq.*). Under the statute, the County Collector (an *ex officio* role of the County Treasurer) conducts the sales. Purchasers do not receive clear title to the property at issue, but rather a Certificate of Purchase and the right to collect the amount of unpaid taxes from the owner plus a "penalty" ranging from 0 to 18% interest. The winning bidder for a given property is the one who is willing to accept the lowest penalty rate if the owner exercises their right of redemption. Each successful bidder pays the County the amount of the delinquency. The maximum penalty percentage that may be bid is 18%. If no bids are received on a given property, it reverts to the County at the maximum penalty rate.

For example, a property with a $2000 overall delinquency is offered at the tax sale. One bidder offers 18% – meaning that he will pay $2000 to the County and charge the property owner an additional 18%, if they want to redeem the property. Another bidder offers 13%. If this is the winning bid, the property owner would pay less to redeem the property. If no lower bids are received, the second bidder receives the Certificate of Purchase.

If a property owner fails to redeem a property within the statutory redemption period, the successful bidder may file a petition for a tax deed. Once a tax deed is issued, it conveys merchantable title, free and clear from most previous interests in the property.

If the property is redeemed, the purchaser of the tax lien receives the certificate amount (what it paid to the County) plus the penalty percentage. The penalty rate increases every six months by the amount of the penalty rate that was originally bid. Using the above example, the

property owner would owe the winning bidder $2,260 if redeemed within six months, $2,520 if redeemed between six months and a year, $2,780 if redeemed between a year and 18 months, etc. The holder of a tax lien may also pay subsequent unpaid real estate taxes on a property and claim an automatic 12% penalty on the subsequent taxes. An owner or other eligible party wishing to redeem the property pays the total amount owed to the County, which in turn sends that amount to the tax purchaser.

Because the cost of redemption is usually significantly less than the market value of the property, there is a strong incentive for anyone holding a sizeable ownership or security interest in the property to redeem it following a tax sale. For that reason, if a property owner is unable to pay the cost of redemption, it is common for a mortgage holder or other lienholder to redeem on behalf of the property owner in order to preserve their interest. The amount paid on the owner's behalf is then added to the owner's outstanding obligation.

Plaintiffs claim that the St. Clair County tax sale process was tainted in 2007 and 2008. Specifically, they allege that Defendant Suarez, in exchange for political contributions for himself and the St. Clair County Democrat Party, arranged for the auctioneer to recognize the Purchaser Defendants as winning bidders (presumably in cases of identical bids) and to distribute the winning bids between the Purchaser Defendants. (Doc. 2 at ¶¶74, 79). They also allege that Suarez arranged for representatives tied to Purchaser Defendants to have advantageous seating positions and caused the auctioneer to ignore subsequent (or "trailing") lower bids, thereby artificially inflating the penalty rates. Finally, Plaintiff's allege that the Purchaser Defendants agreed amongst themselves to keep their bids at or near the 18% statutory maximum penalty rate. (*Id.* at ¶74).

Plaintiffs owned two properties that were sold at the 2007 St. Clair County real estate tax

sale conducted in November 2008. (*Id.* at ¶¶6-11). The first property is located at 518 E. Washington St., O'Fallon, Illinois ("Washington Property"); the second property is located at 619 W. Schuetz St., Lebanon, Illinois ("Schuetz Property"). Both properties were purchased by Defendant White Oak Securities at 18% penalty rates and were subsequently redeemed on November 8, 2011 by mortgage holder First Federal Savings Bank (Docs. 268-4 and 268-5). Because the redemption took place nearly three years after the sale, $1,725.03 in penalty interest was assessed on a $1,597.25 tax bill for the Washington Property. (Doc. 268-4). Redemption of the Schuetz Property cost $2,018.22 in penalty interest on a $1,868.72 2007 tax bill. (Doc. 268-5). Both properties were sold at tax sales several years before and several years after the 2007 tax year sales at lower penalty rates. (Docs. 278-2 and 278-3).

Plaintiffs assert eight causes of actions, including claims against all defendants for Civil Conspiracy (Count I), violations of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 and 2 (Counts III and IV) and violations of the Illinois Antitrust Act, 740 ILCS 10/1, *et seq.* (Counts V-VII). They also assert claims for money had and received against all defendants except Suarez (Count II) and breach of fiduciary duty against Suarez alone (Count VIII). In each Count, Plaintiffs allege damages "based on the difference [between] the amount redeemed and the amount that would have been needed to redeem the property at a reasonable and appropriate penalty rate[,]" plus attorneys' fees, expenses and trebling of damages where allowed by statute. (Doc. 2).

## LEGAL STANDARD

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The

moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). When deciding a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

## DISCUSSION

### Defendant Kenneth Rochman

As an initial matter, Defendant Kenneth Rochman filed for summary judgment of the claim asserted against him individually. (Doc. 267). He maintains that he is entitled to judgment as a matter of law because there are no allegations or evidence connecting him to the alleged scheme.

Plaintiffs did not respond to Rochman's motion. Under this Court's local rules, "[f]ailure to timely file a response to a motion may, in the Court's discretion, be considered an admission of the merits of the motion." SDIL-LR 7.1(c). The Court finds it appropriate to invoke Rule 7.1(c) in this situation. Accordingly, Defendant Kenneth Rochman's Motion for Summary Judgment is granted.

## Statute of Limitations

Defendants argue that the applicable statutes of limitations bar Plaintiffs' claims. (Doc. 271 at 12-16). The statutes of limitations for claims grounded in state law are governed by the law of that state. *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). Like the statute of limitations itself, state rules that are an "integral part of the statute of limitations" such as tolling and equitable estoppel, are also applied by federal courts to state law claims. *Hollander v. Brown*, 457 F.3d 688, 694 (7th Cir. 2006) (citing *Walker v. Armco Steel Corp.*, 446 U.S. 740, 751–53 (1980)).

Civil conspiracy (Count I) is not a separate and distinct tort in Illinois. *See Weber v. Cueto*, 624 N.E.2d 442, 449 (1993). Rather, "[a] cause of action for civil conspiracy exists only if one of the parties to the agreement commits some act in furtherance of the agreement, which is itself a tort." *Adcock v. Brakegate, Ltd*., 645 N.E.2d 888, 894 (1994). *See also Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) (a claim for civil conspiracy requires "at least one tortious act by one of the co-conspirators in furtherance of the agreement."). As a result, a civil conspiracy claim is subject to the same statute of limitations as the underlying tort on which the claim is based. *Mauvais–Jarvis v. Wong*, 987 N.E.2d 864, 894 (2013).

Claims for money had and received (Count II) and breach of fiduciary duty (Count VIII) must be commenced within 5 years after the cause of action accrued. 735 ILCS 5/13-205.

A 4 year statute of limitations applies to violations of the Sherman Act (as enforced by private parties under the Clayton Act) (Counts III and IV). 15 U.S.C. § 15b. Relatedly, a federal antitrust cause of action "accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir.

2006) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (*Zenith II*).

A private action for violation of the Illinois Antitrust Act (Counts V-VII) must be commenced within 4 years after the cause of action accrued. 740 ILCS 10/7(2). In the context of an antitrust conspiracy, accrual is generally triggered by the last overt act in furtherance of the alleged conspiracy. *People ex rel. Hartigan v. Moore*, 493 N.E.2d 85, 86 (1986).

Here, the tax sale in question took place on November 10, 2008. (Doc. 230-4 at 78). Plaintiffs have not alleged any overt acts in furtherance of the alleged conspiracy after the sale. Nor do Plaintiffs claim that their injury arose from any act committed after November 10, 2008. Plaintiffs filed this lawsuit on October 17, 2014 – five years and eleven months later. (Doc. 2). Facially, Plaintiffs' claims in Counts I and III-VIII appear to have been filed out of time. The only claim that is not barred on its face is Count II for money had and received, because penalty was not paid until November 8, 2011.

Plaintiffs contend that their claims are timely by application of the "discovery rule." Under the discovery rule, the statute of limitations' accrual date "is not determined when the injury occurs but when it is discovered or should have been discovered." *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 688 (7th Cir. 2004). When the discovery rule applies, a statute of limitation begins to run "once a plaintiff has knowledge which would lead a reasonable person to investigate the possibility that her legal rights had been infringed." *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 992–93 (7th Cir. 2002); citing *LaSalle v. Medco Research, Inc*., 54 F.3d 443, 446 (7th Cir. 1995). *See also Khan v. Deutsche Bank AG*, 978 N.E.2d 1020, 1029 (2012) ("When a party knows or reasonably should know both that an injury has occurred and that it was wrongfully caused, the statute begins to run and the party is under an

obligation to inquire further to determine whether an actionable wrong was committed"). The discovery rule has been applied to antitrust claims, as well as breach of fiduciary duty claims. *See In re Copper Antitrust Litig.,* 436 F.3d at 789 (7th Cir. 2006), and *Fuller Family Holdings, LLC v. N. Tr. Co.*, 863 N.E.2d 743, 756 (2007).

The relevant question then is when Plaintiffs knew or should have known that they had sustained an alleged wrongfully-caused injury.[3] At one point during her deposition, Kathleen Dvorak testified that "[t]he high interest rate" led her to believe that the sales were illegally conducted or rigged, and the 18 percent rate "on its face struck [her] as being wrong based on [her] prior experience of redeeming at a much lower interest rate[.]" (Doc. 272-1 at 41:19-42:21, 43:2-44:7, 76:10-13). She also testified that she knew the properties had been sold at the 18% rate for the 2007 tax year shortly after the tax sale had occurred. (*Id.* at 90:14-91:1). However, she testified elsewhere that she did not recall seeing the 18% penalty rates until she received "take-notice" letters issued in June 2011, although she admitted knowing that they send out notices shortly after the auctions. (*Id.* at 69:20-70:12, 88:1-23). She also testified that it was the interest rate on the redemption certificates (issued upon redemption in 2011) that caused her to believe the auctions may have been rigged. (*Id.* at 75:12-24). At another point, she claimed that she did not remember the rates the Properties had fetched at previous auctions when she saw the 18% rates, and that she looked those up sometime later and was "shocked" at that point. (*Id.* at 124:13-125:4). Finally, she testified that she did not actually appreciate that she might have been

---

[3]Kevin Dvorak testified in his deposition that his wife handles the financial matters in the household, that he was not significantly involved with the current matter and had no personal knowledge of any of the allegations in the Complaint other than the fact that he owned the properties, and that they were sold for delinquent taxes and eventually redeemed. (Docs. 271-5 at 3 and 278-6 at 4-5). As such, it is Kathleen Dvorak's testimony that is pertinent to the statute of limitations issue.

wrongly injured until October 2014, when a letter from Ken Brosh was left at the Washington Property. (*Id.* at 48:1-22).

A plaintiff may defeat summary judgment with her own deposition testimony where there is a genuine issue of fact as to plaintiff's subjective experience. *Xodus v. The Wackenhut Corp.*, 626 F. Supp. 2d 861, 863 (N.D. Ill. 2009) (citing *Paz v. Wauconda Healthcare & Rehabilitation Centre, LLC*, 464 F.3d 659, 664–65 (7th Cir. 2006)). But if "sham" contradictions are created to defeat summary judgment, the Court may disregard the contradictory testimony; for instance, when a party submits either an errata sheet changing the substance of their testimony or submits an affidavit on summary judgment that contradicts their prior testimony or sworn statements. See *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162 (7th Cir. 1996).

Here, Dvorak's deposition testimony regarding when she had information sufficient to put her on notice of wrongful injury is obviously contradictory. That said, there is no indication that the contradictions are a "sham" – manufactured for the purpose of creating an issue of fact where none would otherwise exist.

The Court cannot decide the credibility of testimony or weigh the evidence in making findings as a matter of law. Thus, when Plaintiffs knew or should have known that they allegedly had been victimized by the 2007 auction is a material issue of fact for the jury's determination. Summary judgment on statutes of limitations grounds is therefore inappropriate.

### Federal Antitrust Claims

Relying on the Supreme Court's Decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), Defendants first argue that Plaintiffs' antitrust claims fail as a matter of law because Plaintiffs were "indirect purchasers" instead of "direct purchasers" with regard to the redemption of the Washington and Schuetz Properties. (Doc. 268 at 5). In *Illinois Brick*, the Court held that

treble-damage antitrust claims were not available for those who were not paying the allegedly inflated price directly to the wrongdoer. Citing *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), the Court expressed its "unwillingness to complicate treble-damages actions with attempts to trace the effects of the overcharge on the purchaser's prices, sales, costs, and profits, and of showing that these variables would have behaved differently without the overcharge[.]" 431 U.S. at 725–26 (internal quotations omitted).

Here, Defendants' argument fails as to the federal antitrust claims because Plaintiffs are not indirect purchasers with regard to the redemption of the Washington and Schuetz Properties. The tax sale statute specifically provides that "[a]ny redemption shall be presumed to have been made by or on behalf of the owners and persons interested in the property and shall inure to the benefit of the persons having the legal or equitable title to the property redeemed, subject to the right of the person making the redemption to be reimbursed by the persons benefited." 35 ILCS 200/21-345(2). While the payments to redeem the Washington and Schuetz Properties were made by First Federal Savings Bank, Defendants have advanced no argument to rebut this presumption.

Even if Plaintiffs were deemed indirect purchasers, the rationale behind an exception to the indirect purchaser doctrine applies under the facts in this case. In *Illinois Brick*, the Supreme Court left open potential exceptions to the indirect purchaser bar; one of which is triggered if the indirect purchaser received the goods from the direct purchaser pursuant to a pre-existing cost-plus contract. *In re Bulk Petroleum Corp.*, 796 F.3d 667, 677 (7th Cir. 2015). In that situation, the complexity and confusion associated with tracing the knock-on effects of the inflated price don't exist. Rather, "[t]he effect of the overcharge is essentially determined in advance, without

reference to the interaction of supply and demand that complicates the determination in the general case." *Illinois Brick*, 431 U.S. at 736.

The amount that First Federal Savings Bank passed along to the Dvoraks was limited to the amount it paid to redeem the properties. This is equivalent to the exceptional situation described in *Illinois Brick*. The effect of the overcharge is determined in advance and there is no elasticity in the process. There are no or other factors that could have affected the amount First Federal Savings Bank assessed Plaintiffs. The alleged overcharge was transmitted directly to the Dvoraks, thereby eliminating any distinction between a direct or indirect purchaser. Therefore, summary judgment is not warranted on these grounds.

Defendants also challenge the sufficiency of evidence of an antitrust conspiracy as required under Section 1 of the Sherman Act. "To prevail under § 1 under any theory, plaintiffs generally must prove three things: (1) that defendants had a contract, combination, or conspiracy ("an agreement"); (2) that as a result, trade in the relevant market was unreasonably restrained; and (3) that they were injured." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011) (citing *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993).

A plaintiff relying on circumstantial evidence of conspiracy "must show that the inference of conspiracy is reasonable in light of the competing inference[] of independent action." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 599 (7th Cir. 1995) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). The Seventh Circuit has distilled this determination into a 3-step analysis:

> 1) review the evidence of conspiracy submitted by the plaintiff; 2) examine whether the defendants have offered evidence that tends to show that the conduct which forms the basis of the plaintiff's complaint is as compatible with the legitimate business activities of the defendant as it is with illegal conspiracy; and

3) if the evidence of conspiracy is ambiguous, determine whether the plaintiff can point to any evidence that tends to exclude the possibility that the defendants were pursuing their legitimate independent interests.

*Id.* (citing *Market Force, Inc. v. Wauwatosa Realty Co*., 906 F.2d 1167 at 1171-72, (7th Cir. 1990)).

Plaintiffs point to the higher overall weighted average bidding in St. Clair County for the 2006 and 2007 tax year auctions compared with other years and other counties as evidence of the alleged conspiracy. They also cite the testimony of competing tax buyer Ken Brosh, that representatives associated with Purchaser Defendants were given advantageous seating positions, that otherwise "tied" bids would be awarded to Purchaser Defendants, and that lower bids by non-Purchaser Defendants would not be accepted. (Deposition of Ken Brosh, Doc. 278-8 at 19:4-20:23; 35:1-4; 66:16-19; 108:18-21 and 172:3-17).

To rebut Plaintiffs' reliance on circumstantial evidence of conspiracy, Defendants quite effectively offer alternate explanations for the higher weighted average bidding, including higher supply due to the early stages of the 2008 financial crisis and lower bidder turnout due to more competing tax auctions taking place the same week than in other years. However, their challenges to Brosh's testimony – that he admitted he was also attempting to get the highest penalty rates he could, that the alleged favoritism also occurred in years other than the auctions at issue, and that the alleged refusal of the auctioneer to recognize lower trailing bids for those not seated in the front row – relate to the question of credibility. (Doc. 270 at 6, 15 n. 3). The credibility of this evidence isn't the issue at this point; the issue is the existence of facts which, if believed by the trier of fact, could show collusive conduct.

If believed, Brosh's testimony tends to exclude the possibility that the alleged wrongful anticompetitive effect on the market as a whole was the result of independent action. As such,

sufficient circumstantial evidence of a conspiracy exists to survive summary judgment on that point.

Next, Defendants argue that Plaintiffs cannot succeed on their antitrust monopoly claims (Count IV and VII) because they have not presented any evidence of monopoly power or exclusionary conduct. (Doc. 268 at 8). Section 2 of the Sherman Act, 15 U.S.C. § 2, makes it unlawful for a person or company to monopolize and exclude competition. To prove monopolization, a plaintiff must show: "(1) the possession of monopoly power in the relevant market and (2) the willful...maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). The Supreme Court has defined monopoly power as "the power to control prices or exclude competition." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Possessing monopoly power does not by itself constitute impermissible monopolization. *Grinnell*, 384 U.S. at 570–71. Rather, § 2 of the Sherman Act makes it unlawful to maintain monopoly power through exclusionary conduct. *Verizon Comm., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

Monopoly power may be shown either "through direct evidence of anticompetitive effects," or "by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in that case." *Toys 'R Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000). With respect to the latter method of proof, "[t]he existence of such power ordinarily may be inferred from the predominant share of the market." *Grinnell,* 384 U.S. at 571. There is no bright-line test for what level of market share equates to sufficient market power to constitute a monopoly. *Id.* at 571 (87% of the market is a

monopoly); *American Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) (over two-thirds of the overall market is a monopoly).

The record in this case raises a genuine issue of material fact as to market share and monopoly power. As this Court has previously noted, the relevant market is real estate tax liens in St. Clair County. *Bloyer v. St. Clair Cty. Illinois,* 179 F. Supp. 3d 843, 849 (S.D. Ill. 2016). Plaintiffs offer evidence showing that Defendants won 87.81% of the tax auction bids for the tax years allegedly influenced by the anticompetitive actions. (Doc. 279 at 5, citing Doc. 268-2 at 2). This percentage is within the range of what courts have found sufficient market share to constitute monopolistic market power.[4]

Additionally, Ken Brosh's previously discussed testimony creates a triable issue of fact as to whether there was exclusionary conduct because it could reasonably support a finding of an attempt to exclude outside bidders. Therefore, Defendants are not entitled to summary judgment on the issue of monopoly power.

Defendants St. Clair County and Suarez assert that they are exempt from liability for Plaintiff's federal antitrust claims under the state action doctrine and the Illinois Local Government Antitrust Act ("LGGA"). The state action doctrine exempts actions taken by states through their legislatures from federal antitrust law on principles of federalism and state sovereignty. *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 370 (1991), (citing *Parker v. Brown*, 317 U.S. 341, 350-51 (1943)). On the other hand, municipalities and other political subdivisions are not *per se* exempt because they are not themselves sovereign entities to which those principles apply. In order for the exemption to apply to these entities, the

---

[4] Defendants point to the fact that other buyers did win tax certificates at the 2007 and 2008 tax year auctions, including 50 that Brosh won in the 2007 tax year auction, and assert that "if the named Defendants had monopoly power, this could not and would not have occurred." (Doc. 268 at 9). However, the exclusion need not be total in order to qualify as improper monopolistic conduct—courts routinely entertain monopoly claims where the market share is less than 100 percent, as discussed above.

anticompetitive activities in question must be authorized by the state "pursuant to state policy to displace competition with regulation or monopoly public service" and a party claiming exemption must demonstrate "clear articulation of a state policy to authorize anticompetitive conduct[.]" *Town of Hallie v. Eau Claire*, 471 U.S. 34, 38-40 (1985) (citations omitted). This "clear articulation" need not be absolutely explicit, as long as suppression of competition is the "foreseeable result" of what the statute authorizes. *Id.* at 42.

Here, Suarez and St. Clair County fail to articulate how suppression of competition is a foreseeable result of the Illinois statutory scheme for auctioning of unpaid real estate tax certificates. As such, they have not demonstrated that the state action doctrine applies.

Under the LGAA, "[n]o damages, interest on damages, costs, or attorney's fees may be recovered under section 4, 4A, or 4C of the Clayton Act (15 U.S.C. §§ 15, 15a, or 15c) from any local government, or official or employee thereof acting in an official capacity." 15 U.S.C. § 35. "Local Government" is defined to include counties. 15 U.S.C. § 34(a). Plaintiffs do not address St Clair County's claimed exemption under the LGAA. They argue only that Suarez is not entitled to the exemption because his alleged actions in connection with anticompetitive activities were not undertaken in his official capacity.

Plaintiffs have not identified any evidence that Suarez was involved in the alleged bid rigging. In fact, they offer no evidence regarding any actions undertaken by Suarez himself. They merely cite Defendant John Vassen's deposition testimony that he had known Suarez for 35 years, considered them "friends," and that his relationship with Suarez was "the same as his relationship to the convicted Madison County Treasurer, Fred Bathon." (Doc. 283 at 8, citing Doc. 278-10 at 46-47, 60, 63). However, Vassen also clarified that by "relationship," he meant the general association between County Treasurer and buyer of tax liens. (Doc. 278-10 at 46).

Although Vassen also testified that he made campaign contributions to county treasurers, including Suarez  (*Id.* at 46-47), the inferences Plaintiffs would have this Court draw from this testimony are far from reasonable.

Plaintiffs also refer to Stipulations made by Defendants Barrett Rochman, Scott McLean and John Vassen in an unrelated criminal case regarding tax lien auctions in neighboring Madison County as support for their claims against Suarez.   While the Stipulations detail the same or similar conduct alleged in this case, they are wholly irrelevant to Plaintiffs' claims against Suarez.   Without evidence of some conduct other than the acceptance of campaign contributions, there is no indication that Suarez was acting outside the scope of his official duties.   For these reasons, the LGAA's damage exemption applies to the federal antitrust claims asserted against St. Clair County and Suarez.   With regard to the remaining Defendants, Plaintiffs must clear another hurdle.

Antitrust claims require that the plaintiff prove the defendant violated antitrust law and that the violation caused them some injury.   *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 818 (7th Cir. 2012) (citations omitted).   "To establish an antitrust injury, a plaintiff must show not only that the injury is of the type intended to be protected by the antitrust laws, but that the violation was 'the cause-in-fact of the injury: that but for the violation, the injury would not have occurred.'"   *O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565, 573 (7th Cir. 1994) (citing *Greater Rockford Energy & Technology,* 998 F.2d at 394–96). Evidence of overall market harm is not sufficient to establish antitrust injury; "individual injury (also known as antitrust impact) is an element of the cause of action[.]"   *Reed v. Advocate Health Care*, 268 F.R.D. 573, 581 (N.D. Ill. 2009) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008), as amended (Jan. 16, 2009)).

Plaintiffs request as damages "the difference of the amount redeemed and the amount that would have been needed to redeem the property at a reasonable and appropriate penalty rate." (Doc. 2). Thus, they must produce competent evidence that the 18% penalty rate they paid on the Washington and Schuetz poperties was more than the "reasonable and appropriate penalty rate" for those properties in the 2007 tax year, and by how much. Plaintiffs have disclosed two expert witnesses in this case, but neither has offers an opinion as to what the reasonable penalty rates should have been for the Washington and Schuetz Properties for the 2007 tax year sale absent the alleged bid rigging scheme.

Victoria Harper, former Fulton County, Illinois Treasurer, analyzed overall bidding in historical tax sale data and opined that there were "unusually high interest rates" overall in the 2006 and 2007 St. Clair tax auctions. (Harper Expert Report, Doc. 218-1 at 1). She offered no opinion, however, as to whether the penalty rates paid on the Washington and Schuetz Properties for the 2007 tax year were higher than they might be otherwise. In fact, Plaintiffs confirm that Ms. Harper is not "offering opinions as to complex macro-economic issues or as to Plaintiff's damages[.]" (Doc. 234).

Plaintiffs also disclosed Dr. Carl Peters as an expert. Dr. Peters conducted statistical analyses (including calculating weighted average bidding) regarding the overall results of the 2006 and 2007 tax year auctions and how they compare with other years and other counties. (Peters Expert Report, Doc. 255-1). However, during his deposition, he conceded that his methodology does not provide a basis to determine what rate would have applied to any particular property owner's delinquent taxes absent the alleged wrongful acts. (Deposition of Carl Peters, Doc. 255-2 at 117:8-118:1).

Plaintiffs point only to the overall weighted average bids for the St. Clair County market in 2006 and 2007 compared with other years and other counties as evidence that the alleged anticompetitive conduct had an antitrust impact. But this information is not probative of whether Plaintiffs themselves paid more than they would have if the auctions were not allegedly manipulated. In the absence of even a scintilla of evidence regarding what the penalty rates on the Washington and Schuetz Properties should have been in 2007, Plaintiffs cannot prove antitrust injury or make a submissible case on damages. The jury would improperly be left to rely on mere speculation and guesswork.

### Illinois Antitrust Act Claims

Defendants challenge Plaintiffs' state antitrust claims as well. Under Illinois law, federal courts' interpretation of federal antitrust law guides state courts' construction of substantially similar Illinois antitrust law. *State of Ill., ex rel. Burris v. Panhandle Eastern Pipe Line Co.*, 935 F.2d 1469, 1480 (7th Cir.1991). As such, the Court's above analysis of the federal statutes and case law applies to the equivalent state law claims.

Defendants also seek to invoke the indirect purchaser doctrine on the state antitrust claims. But the state law antitrust claims are not affected by whether Plaintiffs are deemed direct or indirect purchasers. The Supreme Court has specifically held that *Illinois Brick* does not pre-empt state law with regard to indirect purchasers; that is, it does not prevent indirect purchasers from recovering damages under state antitrust laws where the state laws otherwise allow it. *See*, *California v. ARC Am. Corp.*, 490 U.S. 93 (1989).

The applicable Illinois statute provides that "[n]o provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages." 740 ILCS 10/7(2). Defendants correctly point out that the statute prohibits indirect purchasers from maintaining a

class action for antitrust violations. But because class certification has been denied in this case, that provision is no barrier to the Dvoraks maintaining their own claims. Summary judgment is not proper on these grounds.

As was the case with respect to the federal antitrust claims, Defendants Suarez and St. Clair County argue that the provisions of the Illinois Antitrust Act do not apply to them, and therefore, the state law antitrust claims should be dismissed. (Doc. 272 at 5-6). They refer to Section 5 of the statute, which provides, "the activities of a unit of local government or school district and the activities of the employees, agents and officers of a unit of local government or school district" are not subject to the statute. 740 ILCS 10/5(15). The Illinois Constitution's definition of "units of local government" includes counties. Ill. Const. 1970, art. VII, § 1.

Plaintiffs do not challenge St. Clair County's assertion that it escapes state antitrust liability under Section 5(15), but once again, they contend Suarez does not qualify because his alleged conduct in participating in anticompetitive activities were outside the scope of his official authority. *Lathrop v. Juneau & Assocs., Inc. P.C.*, 220 F.R.D. 330, 338 (S.D. Ill. 2004). As previously noted, Plaintiffs have produced no actual evidence indicating that Suarez engaged in any anticompetitive or collusive activities. Therefore, the Section 5(15) exemption applies.

## State Common Law Claims

### *Breach of Fiduciary Duty*

Suarez, the only defendant against whom the breach of fiduciary duty claim is asserted, argues that he is entitled to public official immunity. Under that doctrine, "a public officer is immune from individual liability for the performance of discretionary duties in good faith." *Kinzer on Behalf of City of Chicago v. City of Chicago*, 539 N.E.2d 1216, 1220 (1989). While an official performing discretionary duties is entitled to immunity, one performing ministerial

duties is not.  The distinction between discretionary and ministerial acts is murky at the best, and

must be made on a case-by-case basis.  However, Illinois law generally…

> …deems discretionary acts as those that are unique to a particular public office, and involve the making of a decision about whether or how to perform a particular act following the exercise of personal deliberation and judgment.  In contrast, ministerial acts are those which a person performs on a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, and without reference to the official's discretion as to the propriety of the act.  That is, ministerial acts are those acts that are absolute, certain and imperative, involving merely the execution of a set task so that nothing remains for judgment or discretion.

*Wrobel v. City of Chicago*, 742 N.E.2d 401, 406–07 (2000).

Here, Suarez's conduct as developed in the record is discretionary in nature.  The broad

requirements for conducting tax auction sales are spelled out in the Illinois Property Tax Code

and implicate arguably ministerial acts.  That said, significant aspects of how the auctions are to

be conducted are left to the judgment of the organizing official and his or her office.  Therefore,

Suarez is entitle to public official immunity on Plaintiffs' breach of fiduciary duty claim.

### *Civil Conspiracy*

Civil conspiracy claims require proof of a combination of two or more persons for the

purpose of accomplishing by some concerted action either an unlawful purpose or a lawful

purpose by unlawful means.  *Adcock*, 645 N.E.2d at 894.  Conspiracy claims operate to extend

liability beyond the active wrongdoer to those who have planned, assisted or encouraged the

wrongdoer's acts.  *Id.*  To prove civil conspiracy, Plaintiffs must prove not only that a defendant

committed an overt act in furtherance of the conspiracy, but also that the act was tortious or

unlawful.  *Id.*  In other words, there "must be an independent cause of action underlying a

plaintiff's conspiracy claim."  *Siegel v. Shell Oil Co.*, 656 F. Supp. 2d 825, 836 (N.D. Ill. 2009),

aff'd, 612 F.3d 932 (7th Cir. 2010) (citing *Thomas* and *Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 735 N.E.2d 649 (2000)).[5]

Here, Plaintiffs' civil conspiracy claim must rest on their state antitrust and/or breach of fiduciary duty claims. Because those claims are subject to summary dismissal, the conspiracy claim fails as well.

### *Money Had and Received*

Money had and received is a state law claim arising in equity. In order to prove such a claim under Illinois law, a plaintiff must establish that (1) he was compelled to pay money to the defendant, (2) the defendant had no legal right to demand the money, and (3) payment was necessary in order to avoid an injury to his business, person or property. *Butitta v. First Mortg. Corp.*, 578 N.E.2d 116, 118–19 (1991).

The basis of Plaintiffs' claim is the money they paid to redeem the Washington and Schuetz Properties over and above what they allege they should have paid. Defendant White Oak Securities won the tax certificates for the properties at the 2007 tax year auction. (Doc. 2 at ¶¶7, 10). First Federal Savings Bank paid the redemption amounts to St. Clair County. As Plaintiffs acknowledge, the certificate amount and the additional penalty paid by a redeeming party "is in turn paid by the County to the tax purchaser, and the property is released back to its redeeming owner." (Doc. 2 at ¶62). That being the case, St. Clair County did not retain any of the penalty at issue or realize any benefit from it. It played no role with respect to the penalty payments except as an intermediary before disbursing the money to White Oak Securities.

This specific scenario was addressed by the Fifth District Illinois Appellate Court in *Bueker v. Madison Cty.*, 61 N.E.3d 237, 256 (2016), in which that court held that a state law

---

[5] Plaintiff cites to an Illinois Court of Appeals case, *Vance v. Chandler*, 597 N.E.2d 233, 236 (1992), holding that "independent, actionable tortious conduct is <u>not</u> needed" to support a civil conspiracy claim. (Doc. 283 at 11). *Vance*, however, was decided before *Adcock* and the subsequent appellate cases interpreting it.

claim for money had and received based on allegedly rigged property tax penalty rate auction would not lie against the county to which the redemption payment was tendered, as the county passes the payment along to the bidder and does not retain any benefit from the alleged wrongful charge. Plaintiffs acknowledge *Bueker*, but urge this Court to disregard it in favor of *Drury v. McLean Cty.*, 433 N.E.2d 666 (1982).

In *Drury*, individuals who had been convicted and paid fines to the circuit clerk under a statute later found unconstitutional sought to recover the fines and costs from McLean County under the money had and received theory. Plaintiffs mischaracterize the holding in *Drury* as "allowing plaintiffs…to recover for money had and received against funds actually received by the county." (Doc. 283 at 11). That is incorrect. The Illinois Supreme Court actually found that the action would <u>not</u> lie against the County, because 1) the circuit clerk was not a county official and 2) the money had never been received by the county, but was instead distributed by circuit clerk to the town of Normal and the State of Illinois. *Drury* at 670. Here, St. Clair County's position is analogous to that of the circuit clerk in *Drury*, having taken in the money and then disbursed it to another entity. Plaintiffs' reliance on *Drury* is therefore misplaced.

There is no evidence that any of the defendants besides White Oak Securities received and retained the allegedly inflated penalty payments from the Washington and Schuetz Properties or any benefit from such payments. Thus, Plaintiffs' claim for money had and received fails on liability as to Defendants other than White Oak. But that doesn't end the analysis.

Plaintiffs' inability to show that their penalty rates were higher than what they reasonably should have been is fatal to their money had and received claim against White Oak Securities as well. One of the elements of the claim is a showing that the defendant had no legal right to

demand the money. Had White Oak won the bidding on Plaintiffs' properties at "reasonable and appropriate rates," there would be no question that it would have had the legal right to demand payment under the statutory scheme. In the absence of any evidence that the actual rates were higher than the reasonable and appropriate rates, however, a jury would have no basis on which to conclude that White Oak was not legally entitled to collect the full amount it received.

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment (Docs. 265, 266, 267, 268, 269, 270 and 272) are **GRANTED** and the case is **DISMISSED with prejudice**. All other pending motions are **DENIED as MOOT.** The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiffs and to close the case

**IT IS SO ORDERED.**

**DATED: March 29, 2018**

<u>**s/ Staci M. Yandle**</u>
**STACI M. YANDLE**
**United States District Judge**